```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION
```

THE CINCINNATI INSURANCE COMPANIES                       PLAINTIFF


  v.                    Civ. No. 08-5099


COLLIER LANDHOLDINGS, LLC;
COLLIER DRUG STORES, INC.;
BENCHMARK CONSTRUCTION COMPANY
OF NWA, INC., f/k/a JOHN P. MARINONI
CONSTRUCTION COMPANY; STEVEN SMITH;
and HERB CRUMPTON, d/b/a
HERB CRUMPTON & ASSOCIATES                              DEFENDANTS

### MEMORANDUM OPINION

On April 29, 2008, The Cincinnati Insurance Companies ("Cincinnati") filed this action seeking declaration that it has no duty to defend or indemnify Benchmark Construction Company of NWA, Inc. and Steven Smith ("Benchmark") in the underlying Arkansas state-court case of *Collier Landholdings, LLC, et al. v. Benchmark Construction of NWA, Inc. et al.*, no. CV-07-2010-4, pending in the Circuit Court of Washington County, Arkansas. Currently before the Court are motions for summary judgment filed by Cincinnati; Collier Landholdings, LLC and Collier Drug Stores, Inc. ("Collier"); and Benchmark. The summary judgment motions raise a central issue of Arkansas law: whether the defective workmanship of a subcontractor, standing alone, is an "occurrence" under the terms of a commercial general liability ("CGL") insurance policy. This Court must conclude that the defective workmanship of a subcontractor, standing alone, is not an "occurrence" and that an insured

contractor may not recover damages under a CGL policy resulting from a subcontractor's defective work.  Accordingly, the summary judgment motion of Cincinnati (doc. 13) is **GRANTED,** and the motions of Collier (doc. 26) and Benchmark (doc. 31) are **DENIED.**

## I. Standard

The party moving for summary judgment bears the burden of establishing the absence of issues of material fact in the record and of establishing that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Uhl v. Swanstrom*, 79 F.3d 751, 754 (8th Cir. 1996).  The proper construction and legal effect of an insurance contract is a matter of law.  *Elam v. First Unum Life Ins. Co.,* 346 Ark. 291, 297, 57 S.W.3d 165, 170 (2001).  Accordingly, because there are no issues of material fact, disposition by summary judgment is appropriate in this case.

## II.  Background

The duty to defend is broader than the duty to indemnify. *Commercial Union Ins. Co. of America v. Henshall*, 262 Ark. 117, 123, 553 S.W.2d 274, 277 (1977).  As a matter of Arkansas law, the pleadings in an action against the insured generally determine the insured's duty to defend.  *Madden v. Continental Cas. Co.*, 53 Ark.App. 250, 254, 922 S.W.2d 731, 734 (1996).   This is so

regardless of whether those allegations are "groundless, false, or fraudulent."  *Tri-State Ins. Co. v. B & L Products, Inc.*, 61 Ark.App. 78, 83, 964 S.W.2d 402, 405 (1998).  Except where otherwise noted, the following facts are alleged by Collier Landholdings, LLC and Collier Drug Stores, Inc. ("Collier") in the state-court action of *Collier Landholdings, LLC, et al. v. Benchmark Construction of NWA, Inc. et al.*:

1. Collier and Herb Crumpton d/b/a Herb Crumpton & Associates ("Crumpton") entered a building design agreement under which Crumpton designed the Collier Center at Willow Creek ("the Collier Center").
2. The Collier Center contained space for a pharmacy and medical clinic.
3. On July 19, 2004, Collier and Benchmark Construction Company of NWA, Inc. ("Benchmark") entered an agreement under which Benchmark would construct the Collier Center.
4. In June 2005, after substantial completion of the Collier Center and occupancy by tenants, water infiltrated the building through the ceiling, walls, and floor.  Among other things, this caused mold to germinate in the interior walls.
5. The Collier Center suffered extensive damage as a result.
6. In its state-court complaint for breach of contract and negligence, Collier alleges that as the result of Benchmark's defective construction, it suffered damages including, but not

limited to, cost of repair, cost of remediation, loss of use of the building, financing cost, loss of business expectancy, costs, attorney's fees, and other damages.  It states:

### COUNT III
### BREACH OF CONTRACT-BENCHMARK
### CONSTRUCTION OF NWA, INC.

. . . .

38.  Collier and Benchmark entered into a Construction Agreement whereby Benchmark agreed to construct the Building in a manner free from defect and in an otherwise habitable condition.

39.  Benchmark failed to construct the Building in a manner free from defect, and upon information and belief, the Building has substantial defects which led to the infiltration of water into the Building.

40.  Benchmark's failure to properly construct the Building in a manner free from defect was a material breach of the Design Agreement [sic].

. . . .

### COUNT IV
### NEGLIGENCE-BENCHMARK CONSTRUCTION
### COMPANY OF NWA, INC.

. . . .

43.  In constructing the Building, Benchmark was under a duty to exercise the degree of skill and care ordinarily used by other contractors doing similar work.

44.  Benchmark failed to exercise the degree of skill and care ordinarily used by other contractors doing similar work, and as a result, the Building contained significant construction defects.

. . . .

7. Based on the allegations in Collier's complaint, The Cincinnati Insurance Companies ("Cincinnati") denied Benchmark

coverage pursuant to Benchmark's commercial general liability insurance policy. The policy states in relevant part:

**SECTION I - COVERAGES**

**COVERAGE A.  BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
    **1. Insuring Agreement**

      **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" . . . .

      **b.** This insurance applies to . . . "property damage" only if:

        **(1)** The . . . "property damage" is caused by an "occurrence" . . . .

**SECTION V - DEFINITIONS**

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

**20.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    Cincinnati found that Benchmark's claim for coverage failed to satisfy the insuring agreement's definition of coverage because there was no "occurrence" under the policy.

8. Though not alleged in Collier's state-court complaint, the parties do not dispute that in order to fulfill the construction agreement, Benchmark employed the services of subcontractors.[1]

### III. Analysis

In the present case, the interpretation of a commercial general liability ("CGL") insurance contract is at issue. The task of this Court is to interpret the language in question as the Arkansas Supreme Court would if this case were before it. *Crussell v. Electrolux Home Products, Inc.*, 499 F. Supp. 2d 1137, 1138 (W.D. Ark. 2007). In so doing, the Court can consider "related state court precedents, analogous decisions, considered dicta, and other reliable sources in an effort to determine what the Supreme Court's decision would be." *Id*. at 1138-39 (quoting *Kennedy Building Associates v. Viacom, Inc.*, 375 F.3d 731, 738 (8th Cir. 2004)).

For their motions for summary judgment, Cincinnati, Collier, and Benchmark contest the meaning and scope of the term "occurrence." Cincinnati asserts that in the Arkansas state-court

---

[1] Under some circumstances, the insurer must consider certain easily assertable facts when making its coverage determination. *Commercial Union Ins. Co. of America v. Henshall*, 262 Ark. 117, 121, 553 S.W.2d 274, 276 (1977). Benchmark's employment of subcontractors is one such fact.

case of *Collier Landholdings, LLC, et al. v. Benchmark Construction of NWA, Inc. et al.*, the gravamen of Collier's complaint is that Benchmark, through its subcontractors, defectively constructed the Collier Center and thereby caused damage to Collier. Cincinnati further contends that because defective construction is not an "occurrence" under Arkansas law, it has no duty to defend or indemnify Benchmark in the state-court action. Collier counters that Arkansas precedent interpreting the term "occurrence" concerns only defective workmanship on the part of a general contractor and does not apply to a subcontractor's defective work. Further, Collier points to the type of damage that resulted from the allegedly defective workmanship and asserts that this damage is clearly an "occurrence" under the policy. Finally, Benchmark, while conceding that the defective workmanship of its subcontractors is not an "occurrence," contends that damage to non-defective portions of the Collier Center, caused by the intrusion of water into the building, is an "occurrence." As set forth more fully below, this Court holds that the defective workmanship of a subcontractor is not an "occurrence" under Arkansas law.

The language in an insurance policy is to be construed in its "plain, ordinary, popular sense." *Norris v. State Farm Fire & Cas. Co.*, 341 Ark. 360, 363, 16 S.W.3d 242, 244 (2000). "[I]f the provision is unambiguous, and only one reasonable interpretation is possible, [the court] will give effect to the plain language of the

policy without resorting to the rules of construction." *Western World Ins. Co., Inc. v. Branch*, 332 Ark. 427, 430, 965 S.W.2d 760, 761 (1998). "On the other hand, if the language is ambiguous, [the court] will construe the policy liberally in favor of the insured and strictly against the insurer." *Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297, 57 S.W.3d 165, 169 (2001). "Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation." *Id.* Whether contractual language is ambiguous is a matter of law. *Norris*, 341 Ark. at 366, 16 S.W.3d at 246.

Properly interpreting the terms of an insurance contract is not the end of the Court's analysis. Rather, a court must apply the terms of the policy and the facts of a particular case to the established Arkansas framework for litigation of the denial of insurance coverage. Under the framework, when the clause that defines coverage in an insuring agreement is an insurer's basis for denying coverage, the insured bears the burden of proving that his or her claim is covered. *Southern Farm Bureau Cas. Ins. Co. v. Fields*, 262 Ark. 144, 146, 553 S.W.2d 278, 279 (1977). Once the insured has met this burden, the insurer must show that the claim falls within an exclusion to the contract. *Standard Acc. Ins. Co. v. Christy*, 235 Ark. 415, 417, 360 S.W.2d 195, 196 (1962). In the present case, because Cincinnati determined that there was no "occurrence" and denied coverage based on the clause that defines

coverage in the insuring agreement, this Court must determine the breadth of the term "occurrence."[2]

Analysis of *Essex Ins. Co. v. Holder*, 370 Ark. 465, 261 S.W.3d 456 (2007), and the closely-related case of *Nabholz Const. Corp. v. St. Paul Fire & Marine Ins. Co.*, 354 F. Supp. 2d 917 (E.D. Ark. 2005), provide the starting point for this Court's analysis in the present case.  In *Essex*, the Arkansas Supreme Court squarely addressed an issue of first impression: "whether defective construction or workmanship is an 'accident' and, therefore, an 'occurrence' within the meaning of commercial general liability insurance policies."  *Essex*, 370 Ark. at 467, 261 S.W.3d at 457. Addressing this issue, the Supreme Court held that "defective workmanship standing alone-resulting in damages only to the work product itself-is not an occurrence under a CGL policy such as the one at issue here."  *Id*. at 467, 261 S.W.3d at 460.  In so doing, the Supreme Court focused on the accidental nature of an "occurrence" under a CGL policy.  It referenced its precedent defining an "accident" as "an event that takes place without one's foresight or expectation-an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected."  *U.S. Fidelity & Guar. Co. v. Continental Cas. Co.*, 353

---

[2] The Court's discussion of this framework does not modify its application of the summary judgment standard under Federal Rule of Civil Procedure 56.  Rather, the Court injects the framework into this analysis for clarity in terms of understanding the approach of Arkansas courts to denial-of-insurance cases.

Ark. 834, 845, 120 S.W.3d 556, 563 (2003).  The Supreme Court reasoned that faulty workmanship is foreseeable and therefore cannot be deemed to be beyond expectation or accidental.  *Essex*, 370 Ark. at 467, 261 S.W.3d at 459.  In reaching its result, the Arkansas Supreme Court relied heavily on the *Nabholz* case.

In *Nabholz*, decided two years before *Essex*, the United States District Court for the Eastern District of Arkansas correctly predicted that the Arkansas Supreme Court would "elect to join the majority of courts in jurisdictions throughout the country which have concluded that defective workmanship does not constitute an 'occurrence'. . . ."  *Nabholz*, 354 F. Supp. 2d at 922 (internal quotation omitted).  Under the facts of the case, a general contractor entered a subcontract with Nabholz for the construction of a metal building to be used as a church.  *Id*. at 918.  In turn, Nabholz entered a subcontract under which a third company would do work on the building, including completion of a standing seam roof. After the church took possession of the building, the roof began to leak, and Nabholz was ultimately forced to replace the roof.  *Id*. As a result, it filed a claim with its insurance carrier.  *Id*. at 919.  In spite of the facts that the defective workmanship was that of the insured's subcontractor and that the defective workmanship was discovered after the owner took possession of the building, the Court held that there was no "occurrence" as a matter of Arkansas law.  In addition to focusing on the non-accidental nature of

defective workmanship, the District Court noted the important distinction between a CGL policy and a performance bond. It explained:

> The purpose of a CGL policy is to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property. It is not intended to substitute for a contractor's performance bond, the purpose of which is to insure the contractor against claims for the cost of repair or replacement of faulty work. [The contractor] might have elected to purchase a performance bond to protect it from a known business risk that its subcontractor would not perform its contractual duties. That [the contractor] has no remedy for its subcontractor's default under its CGL policy is neither troublesome nor unexpected given the nature of the risk involved.

*Id.* at 923.

The precedent set out in *Essex* and *Nabholz* provides a sufficient basis for the Court's resolution of many issues in the present case. It reveals that the defective workmanship of a subcontractor is not an "occurrence," irrespective of whether the defect is discovered before or after the owner takes possession of the building. Defective workmanship is a foreseeable risk associated with the employment of subcontractors.

The performance bond is the proper instrument for protection against financial loss arising from the repair and remediation of defective construction. It protects the general contractor to the extent of his or her work, irrespective of whether subcontractors performed certain aspects of that work. *See, e.g., Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 603-04 (5th 1991); *see also Nabholz*,

354 F. Supp. 2d at 919 (indicating damage to portions of structure not constructed by contractor covered).  In other words, a general contractor cannot segment his or her work into that performed by various subcontractors, some of which is defective and some of which is not, in order to create an "occurrence."  Accordingly, because the defective construction alleged by Collier is not an "occurrence" under the CGL policy issued by Cincinnati, Benchmark is not entitled to recover the repair and remediation cost arising from its defective workmanship under the policy.

The complaint filed by Collier in the underlying state-court action of *Collier Landholdings, LLC, et al. v. Benchmark Construction of NWA, Inc. et al.* seeks more than damages for the repair and replacement of the defective portions of the Collier Center.  As stated, Collier alleges repeated instances of water infiltration through the ceiling, walls, and floor of the building causing damage throughout the structure.  As a result, it seeks damages based on theories of breach of contract and negligence for repair, remediation, loss of use, loss of business expectancy, costs, attorney's fees, and other damage. Cincinnati contends that because defective workmanship forms the basis for Collier's complaint against Benchmark, all damage caused by or resulting from the defect is not covered under the CGL policy.  In line with the Court's previous analysis, if coverage is to exist, it must exist because these damages arise from an "occurrence" other than

defective workmanship. The Court will address Cincinnati's argument with respect to both contract and tort damages.

In *Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 222, 962 S.W.2d 735, 740 (1998), the Arkansas Supreme Court held that damages awarded for breach of contract cannot be categorized as liability imposed "on account of" or "because of" any "property damage." *Id*. at 222, 962 S.W.2d at 740. In that case, Murphy Oil sought insurance coverage for sums it was forced to pay when it breached a lease by contaminating the property with petroleum products and thereby failing to return the property to its landlord in a state of good condition. *Id*. at 216, 962 S.W.2d at 737. In reaching its holding, the Supreme Court reasoned that Murphy Oil's liability stemmed not from actual damage to the property but "was based on a finding that Murphy Oil failed to restore the leased premises to the condition that they were in at the beginning of the lease term." As such, the damages constituted "'contract damages,' rather than damages awarded 'because of property damage,' as it is the amount that was necessary to place the [lessor] in the position it would have occupied had Murphy Oil honored its obligations under the lease agreement." *Id*. at 224, 962 S.W.2d at 741-42.

Similarly, Collier and Benchmark entered a contractual agreement for the construction of the Collier Center by Benchmark. To the extent that damages result from the breach of that contract,

even if an "occurrence" other than defective workmanship could be identified, the damages cannot be said to be the result of "property damage" under Arkansas law.  Simply, the failure to perform contractual obligations is not "property damage."  This interpretation is consistent with the idea that a performance bond exists to cover a contractor's known contractual risk in a construction project.  Thus, there is no coverage under the CGL policy issued by Cincinnati for damages arising from Benchmark's alleged breach of its contract with Collier.

In *Murphy Oil*, the Arkansas Supreme Court indicated that the outcome may have been different if Murphy Oil's landlord had proceeded under a negligence theory.  331 Ark. at 222, 962 S.W.2d at 740.  The Supreme Court suggested that in such a case, the damages would derive from "property damage" rather than from the failure to perform contractual obligations.  *Id*.  Accordingly, the Court must determine whether there is an "occurrence," other than defective workmanship, that could be the basis for coverage.

The focus of the Arkansas approach is on the act or event that caused the underlying damage and not on the foreseeability of the resulting damage.  4 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 11:26 (2008).  The policy issued by Cincinnati defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As stated, the Arkansas Supreme Court defines an "accident" as "an event that

takes place without one's foresight or expectation-an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected." *U.S. Fidelity & Guar. Co.*, 353 Ark. at 845, 120 S.W.3d at 563.  Benchmark has framed the issue before the Court as one of fact rather than as one of law.  In so doing, Benchmark has presented evidence discovered in the underlying Arkansas state-court action of *Collier Landholdings, LLC, et al. v. Benchmark Construction of NWA, Inc. et al.* that calls the underlying factual premise of both Cincinnati and Collier into question, i.e. that defective workmanship caused all of the damage to the Collier Center.  For example, Benchmark has provided evidence indicating that it was not responsible for the performance or oversight of any of the excavation work at the Collier Center and that the grading, site preparation, and drainage work at the site may have been defective.  Further, Benchmark has presented evidence indicating that a rising watertable and abnormally high rainfall may have contributed to the damage.  Finally, the building remediation process itself may have caused some of the damage of which Collier complains.[3]  As such, Benchmark contends that the acts of other individuals and nature, which caused damage to its work after it turned the building over to Collier, is an "occurrence."

---

[3] Cincinnati urges the Court not to consider this evidence.  However, the full legal basis for this argument is not properly before the Court.

While Benchmark's attempt to demonstrate an "occurrence" other than defective workmanship that would give rise to coverage under the CGL policy is well-taken, its effort is misplaced for two reasons. First, Benchmark has done nothing more than provide the Court with facts that may indicate that it did not breach its contract with Collier and that it was not negligent in constructing the Collier Center, i.e. that it is not liable for the damages suffered by Collier. It has provided the Court with no authority for the proposition that the absence of liability in an underlying state-court action can give rise to an "occurrence" under the policy. Second, as stated, irrespective of their validity, the pleadings against the insured generally determine the insured's duty to defend. *Madden*, 53 Ark.App. at 254, 922 S.W.2d at 734. Collier has done nothing more than allege that defective workmanship was the cause of its damages. If Benchmark is to be held liable in this case, it must be because of defective workmanship, and correspondingly, if its work was not defective, it cannot be liable. Accordingly, an "occurrence" other than defective workmanship has not been alleged, and Cincinatti has no duty to defend or indemnify Benchmark.

**IV. Conclusion**

For the previously-stated reasons, the summary judgement motion of Cincinnati (doc. 13) is **GRANTED**. The summary judgment motions of Collier (doc. 26) and Benchmark (doc. 31) are **DENIED**.

IT IS SO ORDERED this 16th day of April, 2009.

                                          */s/ Robert T. Dawson*
                                          Honorable Robert T. Dawson
                                          United States District Judge